Timothy S. BARROW et al.

v.

D & B VALLEY ASSOCIATES, LLC.

No. 2010–108–Appeal.

Supreme Court of Rhode Island.

June 10, 2011.

Kenneth R. Tremblay, Esq., Portsmouth, for Plaintiff.

Brian G. Bardorf, Newport, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice FLAHERTY, for the Court.

On August 1, 2001, Timothy and Barbara Barrow (the Barrows or plaintiffs) filed suit in the Superior Court for Newport County to quiet title to a strip of land of which D & B Valley Associates, LLC was the record owner. The Barrows claimed title through adverse possession or, in the alternative, through boundary by acquiescence. After a two-day bench trial, the trial justice held that the Barrows had failed to prove by clear and convincing evidence that they had met the requirements for adverse possession of the strip of land for the requisite statutory period. He further concluded that they had failed to show boundary by acquiescence, either through express agreement or recognition by the parties. Judgment was entered in

favor of the defendant, and the Barrows appealed.

This case came before the Supreme Court pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not summarily be decided. After hearing the arguments of counsel and reviewing the memoranda of the parties, we are satisfied that cause has not been shown. Accordingly, we shall decide the appeal at this time without further briefing or argument. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## Facts and Travel

In 1988, plaintiffs acquired a home on Wedgewood Drive in Middletown by warranty deed.[1] They purchased the property, comprising some 12,520 square feet, from Herbert and Claire Weida.[2] The southern border of the property, which was approximately 127.5 feet long, is shared with land, described as lot No. 4–A, owned by D & B Valley Associates, LLC.[3] At the time plaintiffs acquired their property, lot No. 4–A was owned by Peter Dunn. Mr. Dunn had purchased lot No. 4–A on September 12, 1985, from William Smith.[4] Mr. Smith, who had hoped to use the land for commercial development, had been unsuccessful in obtaining the necessary zoning approvals. He sought Mr. Dunn's assistance in developing the property; and, in exchange for Mr. Dunn's involvement, Mr. Smith sold lot No. 4–A to Mr. Dunn.[5]

The greatest barrier to developing the land owned first by Mr. Smith, and later by Mr. Dunn, was the objections lodged by the surrounding homeowners.[6] Specifically, the neighbors, including Mr. Weida, as owner of lot No. 255, were concerned about the location of the parking lot at the office buildings and that Wedgewood Drive would become a heavily traveled route into the commercial development that would increase traffic through the neighborhood. In an effort to smooth the path to approval, Mr. Dunn met with Mr. Weida. In return for Mr. Weida's endorsement of the project, Mr. Dunn gave him permission to use a portion of lot No. 4–A, namely a strip of land between the boundary of Mr. Weida's land and a small stone wall situated

---

1. The property is described as lot No. 255 on Middletown Tax Assessor's Plat 114.

2. The deed described the boundaries of the property as follows:
 "WESTERLY: on Wedgewood Drive one hundred (100) feet;
 "NORTHERLY: by land now or formerly of Peter O'Brien, et ux, being Lot 257 on the hereinafter described Plot one hundred twenty three (123) feet;
 "EASTERLY: by land now or formerly of the State of Rhode Island, one hundred and one tenth (100.1) feet;
 "SOUTHERLY: by land now or formerly of Peter Dunn, one hundred twenty seven and five tenths (127.5) feet."

3. This plat is described as lot No. 4–A on Middletown Tax Assessor's Plat 114.

4. On January 2, 1989, Mr. Dunn deeded the land to a Rhode Island general partnership, D & B Valley Associates, of which he was a partner. Some years later, on June 25, 1997, the partnership transferred the parcel to D & B Valley Associates, LLC. Mr. Dunn is the sole member of the LLC. Thus, as the trial justice noted, "Peter Dunn, either individually or as a partner of D & B or as a member of D & B Valley Associates, LLC, has owned lot No. 4–A, Assessor's Plat 114, continuously since 1985."

5. Mr. Smith wanted to develop office space on both lot Nos. 4–A and 4–B. It appears that Mr. Smith retained ownership of lot No. 4–B.

6. Indeed, Mr. Dunn testified at trial that it was his understanding that Mr. Smith's original proposal was rejected by the local zoning board because of the neighbors' objections.

parallel to the property line.[7] Mr. Dunn also agreed to move the development's parking lot to the parcel's eastern boundary, and he agreed to ask the zoning board for its approval to leave the route to Wedgewood Drive as grass to discourage traffic going through the neighborhood. Ultimately, Mr. Dunn was successful in achieving the necessary permissions to develop the land. Office buildings were constructed on lot Nos. 4–A and 4–B, the egress to Wedgewood Drive was left covered by grass, the planned parking lot was moved, and Mr. Weida made use of the portion of lot No. 4–A between the stone wall on that lot and the edge of his own property.

After the Weidas sold the property to the Barrows in 1988, life on Wedgewood Drive went on peacefully for more than a decade. The Barrows continued to use the strip of land between their property and the stone wall on Mr. Dunn's land, just as the Weidas had done before them.[8] In 1999, however, the Barrows took steps to refinance their property. When an appraiser's opinion about the land's value was lower than what Mr. Barrow expected, he questioned which boundaries the appraiser used in his valuation. It was then that the Barrows claimed that they discovered that the property lines described in their deed were not the property lines as they understood them to be. In an effort to secure title to the land that they had been maintaining between their property and the stone wall (which the record indicated was on Mr. Dunn's property), the Barrows filed suit to quiet title.

A bench trial was held on October 13 and 14, 2009. The trial included the testimony of plaintiffs; Roger Lizotte, a registered land surveyor; Paul Barrow, Timothy Barrow's father and neighbor; Jean Paradis, a title abstractor; and Mr. Dunn. At the conclusion of the trial the trial justice made several findings. Crediting the testimony of Mr. Dunn and unequivocally discounting the Barrows' testimony as self-serving, the trial justice found that "[t]he present use of the disputed area by the plaintiffs is similar and has been similar to the use made of the disputed area by Mr. Weida." Those uses included yard work, such as mowing the lawn, raking leaves, planting a garden and some small trees, picking up and resetting stones that had fallen off the stone wall, storing a sailboat, allowing their children to play in the area, and entertaining.[9] The trial justice further found that Mr. Dunn's "lack of knowledge of the transfer of title from the Weidas to the plaintiffs is credible since the use of the disputed area by the plaintiffs did not change and remained the same as the Weidas' use of the disputed area." Thus, he concluded that "plaintiffs' failure to convince this Court by clear and convincing evidence * * * of any act indicating their ownership of the property inconsistent with the Weidas' permissive use necessitates the conclusion that activity they may have performed on the property was not * * * sufficiently open and notorious to put a reasonable property owner on notice of their hostile claim." Consequently, he denied plaintiffs' request to vest title to the land in them.

7. Specifically, during their conversation, as Mr. Dunn and Mr. Weida walked the grounds, Mr. Weida asked for and received permission to "maintain that piece of land that [was] east of Wedgewood Drive all of the way up to the wall."

8. It should be noted that the stone wall does not extend the entire length of the property line. The remainder of the boundary line was grass, although Mr. Barrow recently had planted some arborvitaes to serve as a buffer.

9. At oral argument, plaintiffs conceded that their use was the same as that of the Weidas.

## Standard of Review

 "The findings of fact of a trial justice sitting without a jury are entitled to great weight and will not be disturbed by this Court absent proof that they are clearly wrong or that the trial justice overlooked or misconceived material evidence." *Tavares v. Beck,* 814 A.2d 346, 350 (R.I. 2003) (citing *Carnevale v. Dupee,* 783 A.2d 404, 408 (R.I.2001)). "However, '[i]n contrast to our deferential stance vis-a-vis factual findings made by a trial justice, we review in a *de novo* manner a trial justice's rulings concerning questions of law.'" *Costa v. Silva,* 996 A.2d 607, 611 (R.I.2010) (alteration in the original) (quoting *Grady v. Narragansett Electric Co.,* 962 A.2d 34, 41 (R.I.2009)).

## Analysis

 Because the trial justice found (and plaintiffs concede) that the Barrows' use was the same or substantially similar to that of the Weidas, the pivotal question facing this Court on appeal is whether the permissive nature of the use came to an end when the owners of the dominant parcel, the Weidas, conveyed their property to the Barrows.[10] We hold that it did not. "When permission is granted for a particular use, a later use *of the same kind* cannot be characterized as adverse." *Hilley v. Lawrence,* 972 A.2d 643, 652 (R.I.2009) (emphasis added) (citing *Stone v. Green Hill Civic Association, Inc.,* 786 A.2d 387,

390 (R.I.2001)). "A permissive use may become hostile only when 'the permission has been withdrawn * * * or [when] events have occurred indicating that the original permission no longer obtained.'" *Id.* (omission and alteration in the original) (quoting *Stone,* 786 A.2d at 390).[11]

This Court previously has considered the effect of the sale of a dominant parcel on permissive uses. *See Hilley,* 972 A.2d at 652. The plaintiffs in *Hilley* were property owners who sued to enjoin their neighbor, Mr. Lawrence, from using a vehicle to cross their land to reach a particular road. *Id.* at 647. Among his many claims, Mr. Lawrence asserted that he was entitled to an easement by prescription. *Id.* at 647–48. The Superior Court rejected that contention and this Court affirmed. *Id.* at 648, 653. In doing so, we held that because the prior owners of Mr. Lawrence's land had permission from the Hilleys to cross the land using a vehicle, the "defendant's initial use was not hostile and could not ripen into a prescriptive easement." *Id.* at 652.

Our reasoning in *Hilley* is equally applicable here. Just as a permissive use cannot ripen into a prescriptive easement, a use that is originally permissive cannot ripen into a claim for adverse possession absent any new hostile act. *See* 10 *Thompson on Real Property* § 87.10 at 138 (David A. Thomas 2nd ed. 1998)

---

**10.** The trial justice ultimately concluded that plaintiffs failed to meet their burden "on a single element of adverse possession." It is unclear whether, by this, he meant that only one element had not been met or that not a single element had been met. On appeal, however, the parties confined their arguments to whether the use was permissive as a matter of law if the permission was granted to a prior owner but the subsequent owner's use was the same. As such, and because it is determinative, we confine our opinion in this appeal to that issue of law.

**11.** The trial justice also denied plaintiffs' claim for boundary by acquiescence. Because plaintiff did not develop an argument on appeal relevant to any purported error by the trial justice, we do not consider that judgment on appeal. *See Richmond Square Capital Corp. v. Mittleman,* 773 A.2d 882, 888 (R.I.2001) ("[I]ssues which have not been fully developed in argument to this Court are not subject to our review.").

("Permissive possession by someone other than the true owner will not start the running of the statute of limitations. One may, however, go into possession through permission and by later acts of hostility, cause the possession to become adverse from the time of such acts.").

The plaintiffs argue that *their* use was *not* permissive because Mr. Dunn's permission extended only to the Weidas and thus ended when the Weidas conveyed the property.[12] In their brief to this Court, plaintiffs cite a Pennsylvania case, *Waltimyer v. Smith*, 383 Pa.Super. 291, 556 A.2d 912 (1989), to support their assertion that the permissive use terminated simply by virtue of the fact that the dominant parcel was sold to new owners. Much like *Hilley*, *Waltimyer* involved property owners who asserted an easement by prescription over property belonging to neighbors, specifically, a joint driveway. *Waltimyer*, 556 A.2d at 913. In *Waltimyer*, *both* of the parcels had been sold in the time since the original permissive use arose. *Id.* The court in that case reasoned, however, that because "[t]he fact that a predecessor in interest may have made similar use of the land in question by permission does not affect the adverse character of a successor's use, because the predecessor's prior permissive use involves merely a revocable *personal* license." *Id.* at 914. The court further concluded that "such a license is not alienable." *Id.* We are not persuaded by the reasoning in *Waltimyer;* and observe that it flies in the face of our holding in *Hilley*, 972 A.2d at 652.

Because the Weidas had permission from Mr. Dunn to make use of the strip of land between lot No. 255 and the stone wall located on lot No. 4–A, the permissive nature of that use could only become hostile when that permission was withdrawn or when the nature of the use changed. Neither of those events occurred here. As such, we affirm the judgment of the trial justice in denying the plaintiffs' petition to quiet title.

## Conclusion

For the above reasons, we affirm the judgment of the Superior Court. The papers in this case shall be returned to that court.

12. The plaintiffs further assert that it is inequitable to deny them relief because they were unaware that the Weidas had permission to use Mr. Dunn's property and, moreover, that they thought their property did extend to the stone wall. On claims of adverse possession, however, adversity is measured against the true owner rather than in light of the rights or perceived rights of the adverse possessor. *See* 10 *Thompson on Real Property* § 87.08 at 129 (David A. Thomas 2nd ed. 1998) ("Occupancy must be so notorious that the owner may be presumed to have knowledge that the occupancy is adverse."). Specifically, the possession must be adverse or hostile to the true owner's rights. *See Tavares v. Beck*, 814 A.2d 346, 351 (R.I.2003). If the true owner has granted permission, albeit to a prior user, then continued use in accordance with that permission is not hostile to any right of the true owner. Additionally, the trial justice rejected the Barrows' testimony about their knowledge of their own boundary lines. The trial justice found that "the testimony of the plaintiffs that they believed that their true southerly border was the stone wall is self-serving and not credible. * * * [T]his [would] have increased their lot by over 6,000 square feet from approximately 12,000 square feet, which was the amount of the lot conveyed to them * * *." Moreover, he noted that "in order to mow the grass in the disputed area, they would have literally had to run into the cement boundary markers left there by the surveyors, which clearly show the southerly boundary line being according to * * * the dimensions of the lot conveyed to them by the Weidas."