June 4, 2026

**Supreme Court**

No. 2025-185-Appeal.
No. 2025-186-Appeal.
(PM 16-2363)

Raymond Desrochers et al.          :

v.          :

Luigi Micheli III.          :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Supreme Court

No. 2025-185-Appeal.
No. 2025-186-Appeal.
(PM 16-2363)

Raymond Desrochers et al.       :

v.             :

Luigi Micheli III.         :

Present:  Suttell, C.J., Robinson, Lynch Prata, and Long, JJ.

## O P I N I O N

**Justice Robinson, for the Court.**  The plaintiffs, Raymond Desrochers and Debra Desrochers, appeal in this adverse possession case from a final judgment that was largely, but not entirely, entered in favor of the defendant, Luigi Micheli III.[1] The plaintiffs object to the trial justice's finding that they failed to prove adverse possession as to one specific portion of the area disputed by the parties.  On appeal, the plaintiffs contend, *inter alia*, that the trial justice erred in ruling that they failed to satisfy the hostility element of their adverse possession claim with respect to the portion of the disputed area which he found they did not adversely possess.

The defendant cross-appeals from the entry of final judgment.  The defendant contends that, with respect to the portion of land that the trial justice found plaintiffs

---

[1]     See Part IV.E., *infra*, where we discuss the defendant's cross-appeal.

- 1 -

adversely possessed, the trial justice erred by failing to find that plaintiffs had not proven the element of hostility. He further argues that plaintiffs did not establish through clear and convincing evidence a sufficiently accurate description of the land which they claim to own through adverse possession.

For the reasons set forth in this opinion, we affirm in part and vacate in part the judgment of the Superior Court.

## I

### Facts and Travel

The controversy in this case relates to abutting properties located in Johnston, Rhode Island. The plaintiffs own the property located at 38 Pine Hill Avenue, while defendant owns the property located at 36 Pine Hill Avenue.

On November 7, 1985, plaintiff Raymond Desrochers took title to 38 Pine Hill Avenue.[2] On July 19, 2011, defendant Luigi Micheli III acquired title to 36 Pine Hill Avenue. The dispute relating to the abutting properties arose in June of 2013, when defendant obtained a survey of his property, which showed that plaintiffs had encroached onto his property. Based on the 2013 survey, defendant began exploratory operations with respect to portions of the encroachments as well as installing a vinyl fence on the disputed area. In May of 2016, defendant sent a

---

[2]     In 1986, Mr. Desrochers conveyed the property to himself and his wife, Debra Desrochers.

- 2 -

"Notice of Intent to Dispute Adverse Possession" to the residents of 38 Pine Hill Avenue.

On May 24, 2016, plaintiffs commenced this action against defendant, seeking to quiet title to the disputed area based on a claim of adverse possession. The plaintiffs also filed a motion for a temporary restraining order to enjoin defendant from engaging in what they alleged to be a trespass. On May 27, 2016, a temporary restraining order was entered, providing that "[n]either the Plaintiffs nor the Defendant shall enter onto the property of the other, located at 38 and 36 Pine Hill Avenue, respectively, said boundary to be temporarily considered to be along the line previously marked by [some vegetation], until further order of this [c]ourt."[3]

An amended complaint was filed on June 2, 2016.[4] Approximately five years later, in March of 2021, defendant filed an answer to plaintiffs' amended complaint. The defendant's answer was accompanied by a counterclaim, which alleged and/or requested the following: (1) declaratory relief to quiet title to the disputed area; (2)

---

[3] On June 3, 2016, defendant filed an "Objection to Plaintiffs' Restraining Order," in which defendant asserted that he had a certified survey indicating that the disputed area was in fact his legal property. An order vacating the temporary restraining order was entered on November 30, 2023. Subsequently, on December 26, 2023, an order reinstating the May 27, 2016 temporary restraining order was entered.

[4] The amended complaint appears to add to the original complaint only a specific reference to an adverse possession claim pursuant to G.L. 1956 § 34-7-1.

"liability for removal and/or destruction of boundary markers;" (3) "trespass and other monetary damages;" and (4) injunctive relief.

The parties filed pre-trial briefs in June of 2024. An "Agreed Statement of Facts and Stipulated Exhibits" was filed on July 17, 2024. Notably, Exhibit 11 in that Agreed Statement indicated that the 2013 survey "fairly and accurately depicts the location of the boundary between the Desrochers Property and the Micheli Property as described in the respective deeds. It also fairly and accurately depicts the locations of the encroachments * * *, as they existed in June of 2013." The Agreed Statement also noted that the survey showed that "a portion of the playground structure and some of [Mr. Desrochers'] construction equipment encroached onto the Micheli Property relative to the boundary shown on the [2013] survey."

A bench trial took place from July 22, 2024 until July 26, 2024. We relate below the salient aspects of what transpired at the trial, and we summarize the testimony of the various witnesses.

**A**

**The Testimony of Raymond Desrochers**

One of the plaintiffs, Raymond Desrochers, was the first witness called to testify. Mr. Desrochers testified that he took title to 38 Pine Hill Avenue in 1985; he stated that, at that time, the property was "all wooded" and undeveloped. He

added that, after purchasing the property, he began cutting down trees to "make room for where the house" that he was constructing was to be located. Mr. Desrochers stated that, at the time when he took title to the property, he had a conversation with George Cioe (one of defendant's predecessors-in-title) relative to the "southerly boundary" of his property. He noted that, on one occasion when he was in the process of cutting some trees, he had asked Mr. Cioe "how far [he could] cut to where [the] line of hemlocks are * * *." Mr. Desrochers testified that Mr. Cioe responded as follows: "[A]s far as I'm concerned, from that side of the hemlocks on is your property. You can cut whatever you like." Mr. Desrochers described the orientation of the hemlocks as "[m]ore or less a straight line from the front of the road [i.e., Pine Hill Avenue] going back along the side of -- between the two property lines." He explained that the "line of trees runs in a generally, east/west direction" with his property lying to the northerly side of the line.

Mr. Desrochers testified that, in 1989, he planted grass roughly fifty-to-sixty feet easterly from the roadway, which went along and up to the hemlock tree line. He further stated that he has continuously maintained that area through regular lawn care, including leaf removal. It was also Mr. Desrochers' testimony that he installed a basketball court area adjacent to the lawn—the surface of which is "stone dust." He additionally stated that, in or about 1989, he installed a semi-circular row of "landscaping stones" that also ran to the tree line, his purpose being to separate the

lawn from the stone dust. According to Mr. Desrochers, in or around 1989, he also performed other work (including regular maintenance) easterly of the stone dust area—such as planting a garden, mulching, and grass-planting, all of which remained in that location until approximately 2014.

Mr. Desrochers also testified relative to the playset, which is located to the east of the just-referenced mulch and planted areas. He stated that he built the playset around 1991 and that there have not been any changes to that area since that time. The playset is located in a rectangular area bordered by retaining rock walls, which were installed by Mr. Desrochers in 1990. Mr. Desrochers testified that a stone dust surface, which was also placed in the area in 1991 and serves as the base for the playset, runs to the tree line. It was Mr. Desrochers' testimony that, since 1991 to "the east, going back" from the southeast corner of the playset, he has stored some of his construction equipment—notably, "[a]luminum poles and staging." He added that this "staging" area runs approximately up to the tree line.

Mr. Desrochers testified that the hemlock tree line, which was no longer in existence as such at the time of trial, was located to the south (i.e., the right) of the boundary line between his property and 36 Pine Hill Avenue. He additionally noted that he never had any discussions relative to the location of the boundary line with the owners who succeeded Mr. Cioe (Marilyn and Russell Bizier) or with the

defendant in this action. According to Mr. Desrochers, the tree line was removed by defendant around 2014.

Mr. Desrochers also testified about numerous photographs that had been admitted as full exhibits; those photographs depicted the original tree line and the stumps of the trees that remained after the removal of the trees themselves. He also testified relative to photographs depicting the areas about which he had previously testified, including but not limited to the portions of land that contained the stone dust and cobblestones, mulch, grass, and the playset. He further testified as to exhibits which depicted the portion of the disputed area where he stored his staging equipment. In addition to those exhibits, Mr. Desrochers testified as to photographs which showed stakes with attached strings that had been placed by both the surveyor during the 2013 survey and also by defendant's father.

On cross-examination, Mr. Desrochers testified that, during the conversation with Mr. Cioe when he was clearing the trees on his property in 1985, he did not discuss installing a playset area for his children. He also acknowledged that, in 1985, he had his land surveyed. However, Mr. Desrochers stated that, at that time, he did not have any conversation with the surveyor relative to the exact location of the boundary line between his property and 36 Pine Hill Avenue and that he was unaware that the hemlock tree line did not coincide with the boundary line. He further acknowledged that he never "had any conversations about the boundary line

whatsoever" with the Biziers, but he added that the Bizier children made use of the playset that he had installed. Mr. Desrochers testified that his use of the disputed area did not change during the Biziers' ownership of the property. Mr. Desrochers maintained that he never sought permission from Mr. Cioe relative to any action that he chose to take regarding the property.

Mr. Desrochers acknowledged that he was unable to provide the "exact square footage" of the disputed area, and he said that he had never measured that portion of land. On redirect examination, while referring to exhibits which showed the playset and also boundary line stakes and strings as well the previous hemlock tree line (and the stumps that existed after the tree line's removal), Mr. Desrochers provided estimates as to the footage and shape of the disputed area.

**B**

**The Testimony of Marilyn Bizier**

Marilyn Bizier was the next witness called to testify. She testified that, in July of 1987, she took title to 36 Pine Hill Avenue with her then-husband.[5] Ms. Bizier stated that, at the time of the purchase of the property, she believed that the row of hemlock trees separating the two properties constituted the boundary between the properties. She noted that the tree line "started right near the street" and ended

---

[5] Ms. Bizier testified that she moved out of the 36 Pine Hill Avenue home in 2001.

"towards the pool" behind her house. It was Ms. Bizier's testimony that she and her then-husband had a friendly relationship with plaintiffs, and she said that their respective children would play together on plaintiffs' playset.

Ms. Bizier testified that she never had any discussions with the sellers of the 36 Pine Hill Avenue property as to where the boundary line was located. She further testified that there was never any mention by Mr. or Mrs. Cioe, or by real estate agents, or by attorneys that Mr. Cioe had given "permission to the Desrochers to use any part of their land."

On cross-examination, Ms. Bizier stated that she had never requested any surveys of the property while she was living there. She additionally testified that she did not recall there being staging equipment located behind the playset. Ms. Bizier stated that she assumed that the disputed area belonged to plaintiffs because it had been cleared and used by them.

## C

### The Rule 50 Motion

Upon the completion of the above-summarized testimony, plaintiffs rested. Immediately thereafter, defendant moved pursuant to Rule 50 of the Superior Court Rules of Civil Procedure for judgment as a matter of law. In support of his motion, defendant asserted that plaintiffs had failed to establish the element of hostility by clear and convincing evidence. The defendant further cited *Coscina v. DiPetrillo*,

186 A.3d 590 (R.I. 2018), arguing that plaintiffs had not established by clear and convincing evidence the dimensions and footage of the disputed area. The trial justice initially reserved decision on the motion. After reviewing the relevant caselaw and the parties' arguments, the trial justice denied defendant's Rule 50 motion.

**D**

**The Testimony of George Cioe**

In presenting his case-in-chief, defendant first called George Cioe to testify. Mr. Cioe testified that he purchased 36 Pine Hill Avenue in or about 1980.[6] He testified that, when he purchased the property, there was a row of hemlock trees separating his property from what is now plaintiffs' property. He added that, prior to plaintiffs' purchasing their property, he did not have any discussions with anyone about the location of the boundary line because he had "always assumed it was the hemlocks." Mr. Cioe further testified that, at some point after Mr. Desrochers began building his house, he had a discussion with him while standing near the hemlock tree line. He specifically recalled:

> "I remember him coming over and us standing by the hemlock trees at the front of the yard. * * * And * * * he was talking about where the land, if I knew where the land was and I just said to him, look, I'm never going to

---

[6]     Mr. Cioe stated that, when he purchased the property in or about 1980, the number assigned to it was 116 Pine Hill Avenue. The record reflects that it has since been renumbered as 36 Pine Hill Avenue.

move these hemlocks. They were huge. What you do on that side is yours. What I do on this side is mine."

Mr. Cioe further testified that, when Mr. Desrochers inquired as to whether he could make improvements on the other side of the hemlocks, Mr. Cioe responded: "[I]f you're on the other side of the hemlocks, you're not anywhere along my property, * * * I don't care what you do at your house." He stated that the improvements that he and Mr. Desrochers discussed included, but were not limited to, a playset.

In the course of the trial, Mr. Cioe was questioned about his testimony at his deposition that was taken as part of the discovery process.[7] Mr. Cioe conceded that, when asked at his deposition if he intended to convey title to Mr. Desrochers, he answered: "I gave him permission to use the property." In response to defense counsel's question if there was "any reason why that would be different today?" Mr. Cioe stated: "Change giving him permission to use, no. Not that I can see." On redirect examination, Mr. Cioe acknowledged that, at his deposition, he had testified to a specific discussion with Mr. Desrochers relative to the boundary line. When asked at his deposition what precipitated that conversation, Mr. Cioe responded:

> "He had bought the lot. Because he was building a house, he had this lot surveyed. And then, I guess, his reason for coming to me was that he had determined that the land on the other side of the trees was, in fact, property of mine that was not used. And he, basically, came to me

---

[7]    Mr. Cioe's deposition testimony was admitted as a full exhibit at trial.

-- asked me permission if he could build some type of plaything for his kids on that property there."

E

**The Testimony of Luigi Micheli III**

The defendant, Luigi Micheli III, was the final witness called to testify. He testified that he owns the land adjacent to plaintiffs' property and that he purchased it in July of 2011 from Mr. Bizier. Mr. Micheli testified that, when he purchased the property, the row of hemlock trees still existed on his property. He added that, although he was not certain as to where the boundary was exactly located, he had not considered the hemlock tree line to be the boundary line separating the properties. It was further his testimony that he had never had a conversation with plaintiffs or the Biziers relative to the location of the boundary line, but he added that Mr. Desrochers had informed him that defendant owned the hemlock trees. Mr. Micheli testified that, before he had a survey of the property carried out in 2013, Mr. Desrochers had requested that he move certain trees that had been planted close to the playset; he stated that he agreed to do so.

According to Mr. Micheli, he had a survey of the property completed in 2013 because of a different potential property dispute. He noted that the surveyor placed stakes at the front and back of the property and that he and his father eventually installed a pole and a string between the stakes, intending for them to serve as indications of the boundary line as determined by the survey.

- 12 -

The defendant rested upon the completion of Mr. Micheli's testimony.

**F**

**The Trial Justice's Decision and the Subsequent Travel of the Case**

In lieu of closing arguments, the parties submitted post-trial briefs in December of 2024.[8] On March 21, 2025, the trial justice rendered a bench decision. He began by providing a recitation of the facts of the case as well as the pertinent law relative to adverse possession claims. The trial justice next ruled that plaintiffs had satisfied the following elements of an adverse possession claim: actual possession as well as open and notorious, continuous, and exclusive use.

Turning to the element of hostility, the trial justice noted that defendant's primary argument was that plaintiffs had received permission from Mr. Cioe during a conversation that took place in 1985. The trial justice further noted that plaintiffs countered by asserting that, even if permission had been given, the sale of the 36 Pine Hill Avenue property to the Biziers would have constituted a new hostile act. However, citing *Barrow v. D & B Valley Associates, LLC*, 22 A.3d 1131 (R.I. 2011), the trial justice noted that this Court in that case held (in the trial justice's words) that "irrespective of which parcel is sold, be it dominant or servient, such alienation does not constitute a new hostile act for purposes of acquisition through adverse possession." The trial justice additionally stated that plaintiffs' reliance on

---

[8] The plaintiffs filed a "Post-Trial Reply Brief" on January 13, 2025.

- 13 -

extra-jurisdictional caselaw was unpersuasive and that it "failed to convince the [c]ourt to pivot from the holding in *Barrow* * * *."

The trial justice next addressed the evidence produced at trial. He specifically stated:

> "Throughout the pendency of this case, Mr. Desrochers' testimony and position are clear that he believed permission was never given. However, at his deposition Mr. Cioe gave a different view of the conversation. He repeatedly stated that he gave permission to Mr. Desrochers to build on the northern side of the hemlocks. When asked what precipitated the conversation regarding the boundary line, Mr. Cioe stated, in quotes, Mr. Desrochers basically came to ask me permission if he could build some kind of plaything for his kids on the property there.

> "Later during the deposition, when asked if they ever spoke about the boundary line at a later date, Mr. Cioe's response was, No. After I gave him permission, we didn't talk about it again. Finally, during his deposition, when asked if Mr. Cioe intended to convey title of the disputed area to Mr. Desrochers, Mr. Cioe answered, in quote, I gave him permission to use the property."

The trial justice further noted that Mr. Cioe's testimony at trial was different from what it had been in his deposition. He summarized Mr. Cioe's trial testimony as follows:

> "[W]hen relaying to the [c]ourt the substance of the conversation with Mr. Desrochers, Mr. Cioe stated, I just said to him, Look, I'm never going to move these hemlocks, and what you do on that side is yours and what I do on this side is mine. This testimony would suggest that if he had desired, he had the ability to move the trees,

- 14 -

in essence suggesting ownership of the land to the north of the trees.

> "However, Mr. Cioe also testified that he informed Mr. Desrochers, If you're on the other side of the hemlocks, you're not anywhere along my property or on my property, I don't care what you do at your house. This statement could also suggest that permission was not given and that Mr. Cioe believed that the hemlock trees were the true property line."

The trial justice found that the differences between Mr. Cioe's deposition testimony and his trial testimony "cloud[ed] the hostility requirement" and that it was never clear to the court "whether or not Mr. Cioe intended to give Mr. Desrochers permission or was affirming his own belief that the land on the northern side of the trees was past his property line." According to the trial justice, the "conversation between Mr. Desrochers and Mr. Cioe [wa]s murky at best."

In assessing the credibility of the witnesses, the trial justice found that, while Mr. Desrochers' testimony was consistent, "he had a vested interest in the outcome." He added that Mr. Desrochers had the property surveyed in 1985, which suggested to the court "some understanding knowledge of the true boundary line." Focusing next on Mr. Cioe, the trial justice observed that Mr. Cioe is "two owners removed and has no interest in this litigation." The trial justice emphasized Mr. Cioe's deposition testimony, in which his recollection about permission was internally consistent. While Mr. Cioe's trial testimony somewhat differed from his deposition testimony, the trial justice stated that Mr. Cioe acknowledged that his deposition

- 15 -

testimony "accurately reflected his understanding of the conversation in 1985." As a result of his conclusion that permission may have been given by Mr. Cioe to Mr. Desrochers, the trial justice found that plaintiffs failed to meet their burden of establishing the element of hostility through clear and convincing evidence.

The trial justice went on to find that the "possible" permission given by Mr. Cioe extended along and to the north of the line of hemlocks. It was his further finding that, based on the evidence presented at trial, "the line of hemlocks terminated right at the footings of the playset." Based on this determination, he ruled that "the portion of the disputed area that continues after the termination of the old hemlock line was sufficiently hostile, as permission for the use of that area was never given by Mr. Cioe or any subsequent owners."

In addressing defendant's argument that plaintiffs failed to define the disputed area, the trial justice rejected the notion that a boundary must be specifically defined by metes and bounds. He explained that, in this case, it was uncontested that the line of hemlocks served "as the demarcation of the boundary line of where the permission was given for use between the two properties and has been established with enough particularity to serve as a basis for a boundary line." Additionally, the trial justice found that the evidence admitted at trial did not establish trespass by plaintiffs.

The trial justice concluded by ruling that

> "the [plaintiffs] have adversely possessed the portion of
> the disputed area that lies from the western footings of the

- 16 -

playset east into the woods where the staging area is kept. The [plaintiffs] have failed to claim the property through adverse possession beyond the line of the hemlocks from Pine Hill Avenue east to the footing of the playset. The [plaintiffs] are given 30 days to remove structures within that area, after which [defendant] may dispose of anything remaining in that area."

For those stated reasons, the trial justice granted in part and denied in part plaintiffs' claim for adverse possession. Similarly, he granted in part and denied in part defendant's request for a declaratory judgment, and he denied defendant's remaining counterclaims.[9]

On June 4, 2025, final judgment reflecting the trial justice's decision was entered, and plaintiffs filed a timely notice of appeal on the same day. The defendant filed a cross-appeal on June 10, 2025.

## II

## Issues on Appeal

On appeal, plaintiffs assert that, pursuant to Rhode Island law, the trial justice erred when he ruled that the conveyance of 36 Pine Hill Avenue did not terminate any alleged permission Mr. Cioe may have given. Second, plaintiffs contend that "the trial justice's factual finding that permission was actually given was clearly wrong and based partially on speculation." Third, plaintiffs argue, in the alternative,

---

[9] The trial justice also suggested that the parties "work together to delineate [the new property line within the disputed area] with a surveyor or to get the metes and bounds for recording purposes." *See* Part IV.E., *infra*.

- 17 -

that any permission that may have been given related only to the playset and not to any other uses or improvements on the disputed area.

In his cross-appeal, defendant principally argues that the trial justice overlooked or misconceived the evidence or clearly erred in finding that "Mr. Cioe's giving of permission to the Desrochers in 1985 only applied to eliminate the 'hostility' element of the Desrochers' claim to adverse possession concerning a specific portion of the Disputed Area at issue, rather than such permission applying to all of the Disputed Area * * *." (Emphasis omitted.) Additionally, in regard to his counterclaim, defendant contends that the trial justice was clearly wrong in rejecting his argument that plaintiffs had failed to prove their claim for adverse possession because they did not establish the location of the disputed area by clear and convincing evidence.

### III

### Standard of Review

This Court "will not disturb the findings of a trial justice sitting without a jury unless such findings are clearly erroneous or unless the trial justice misconceived or overlooked material evidence." *Clark v. Buttonwoods Beach Association*, 226 A.3d 683, 690 (R.I. 2020) (quoting *Quillen v. Macera*, 160 A.3d 1006, 1010 (R.I. 2017)). And we have further stated that "[w]e accord great weight to a trial justice's determinations of credibility, which, inherently, are the functions of the trial court

- 18 -

and not the functions of the appellate court." *Id.* (quoting *Quillen*, 160 A.3d at 1010). Importantly, we have stated that "the deference that this Court affords the trial justice is at its zenith" in cases involving such fact-intensive inquiries as adverse possession. *Butterfly Realty v. James Romanella & Sons, Inc.*, 93 A.3d 1022, 1033 (R.I. 2014) (*Butterfly Realty II*).

Questions of law, by contrast, are reviewed in a *de novo* manner. *Clark*, 226 A.3d at 690.

## IV

## Discussion

## A

## The Parties' Arguments

On appeal, plaintiffs contend that their "use of the disputed area was hostile[10] * * * for well over twenty years."[11] They assert that this Court's holding in *Foley v.*

---

[10] With the exception of the issue concerning the location of the disputed area discussed *infra*, neither party is contesting the trial justice's findings as to the remaining elements of an adverse possession claim. For that reason, we confine our analysis to the issue of hostility.

[11] It will be recalled that the trial justice found that plaintiffs had failed to prove by clear and convincing evidence that they adversely possessed the portion of the disputed area along the previous hemlock tree line. However, the trial justice found that plaintiffs did satisfy their burden as to the portion of the disputed area that extended beyond the tree line. Therefore, it is our understanding that plaintiffs' main contention on appeal pertains to the portion of the disputed area located along the previous hemlock tree line.

- 19 -

*Lyons*, 85 R.I. 86, 125 A.2d 247 (1956),[12] is squarely applicable to the instant case. They emphasize the similarity between the facts in *Foley* and those in the instant case, in that both involve the sale of a servient parcel of land, which terminated the permission granted by a prior owner. The plaintiffs further argue that the facts in the instant case are distinguishable from the facts of *Barrow v. D & B Valley Associates, LLC*, 22 A.3d 1131 (R.I. 2011), and *Hilley v. Lawrence*, 972 A.2d 643 (R.I. 2009), in that both *Barrow* and *Hilley* dealt with the sales of dominant parcels rather than servient parcels.

In the alternative, plaintiffs contend that the trial justice overlooked or misconceived material evidence relative to the alleged permission from Mr. Cioe regarding the use of the disputed area. Specifically, plaintiffs allege that Mr. Cioe's testimony did not "objectively constitute[] a request for permission from [Mr. Desrochers] or his own grant of permission." They add that, if this Court were to hold that Mr. Cioe gave permission to plaintiffs, they would in reply further argue that the permission extended only to the playset and that it did not refer to any other use of the disputed area or improvements thereon.

---

[12]  In *Foley v. Lyons*, 85 R.I. 86, 125 A.2d 247 (1956), this Court held that the sale of a servient parcel terminated permission that had been previously granted to the complainants by the owner of the servient parcel. *Foley*, 85 R.I. at 90, 125 A.2d at 249.

For his part, defendant asserts in his cross-appeal that the trial justice did not misconceive or overlook material evidence in finding that plaintiffs "failed to prove the 'hostility' element of adverse possession by clear and convincing evidence for all of the Disputed Area." The defendant specifically contends that the trial testimony and the other evidence presented at trial relative to the defense of permission

> "if not conclusively precluding the Desrochers from adversely possessing the Disputed Area, was, at the very least, sufficient to raise a question about whether permission existed, which precluded the trial court from finding that there was clear and convincing evidence of 'hostility' and from granting judgment for the Desrochers for adverse possession as a result."

It is further defendant's position that the trial justice was not clearly wrong in rejecting plaintiffs' argument that conveyance of a servient parcel alone "turns a once permissive use into a hostile one for purposes of adverse possession."

With respect to the portion of the disputed area that extended beyond the tree line, defendant asserts that the trial justice misconceived or overlooked material evidence and was clearly wrong in "arbitrarily" finding that plaintiffs had proven by clear and convincing evidence the hostility element of adverse possession. The defendant states: "[T]here was no specific testimony given about the 'western footings of the playset east into the woods,' and there was never any conclusive evidence concerning where or when the construction 'staging area,' as the trial court

- 21 -

put it, came to be on the Disputed Area." The defendant further argues that the testimony elicited at trial does not support the trial justice's "splitting up of the 'permission' granted into two distinct sections of the Disputed Area — one with permission given, and another without."

Lastly, defendant contends that the trial justice was clearly wrong in finding that plaintiffs proved their claim for adverse possession because they had failed to clearly define the exact location and dimensions of the disputed area that they claim to have adversely possessed. According to defendant, the trial justice misinterpreted the relevance of this Court's holding in *Coscina v. DiPetrillo*, 186 A.3d 590 (R.I. 2018). The defendant also takes issue with the trial justice's attempt by using language of his own "to define and separate the two portions of the Disputed Area * * *."

The plaintiffs argue that defendant's cross-appeal fails because sufficient evidence existed in the record to determine the location of the old tree line through "[r]easonable estimates." Additionally, plaintiffs contend that the trial justice has "equity authority to order a survey to more precisely determine and/or describe the boundary between 38 and 36 Pine Hill."

# B

## The Relevant Law

This Court has established that a "party may acquire land pursuant to the doctrine of adverse possession when the elements identified in the General Assembly's codification of this method of acquisition are met." *Union Cemetery Burial Society of North Smithfield v. Foisy*, 292 A.3d 1205, 1214 (R.I. 2023) (internal quotation marks omitted). General Laws 1956 § 34-7-1 provides:

> "Where any person or persons, or others from whom he, she, or they derive their title, either by themselves, tenants or lessees, shall have been for the space of ten (10) years in the uninterrupted, quiet, peaceful and actual seisin and possession of any lands, tenements or hereditaments for and during that time, claiming the same as his, her or their proper, sole and rightful estate in fee simple, the actual seisin and possession shall be allowed to give and make a good and rightful title to the person or persons, their heirs and assigns forever; and any plaintiff suing for the recovery of any such lands may rely upon the possession as conclusive title thereto, and this chapter being pleaded in bar to any action that shall be brought for the lands, tenements or hereditaments, and the actual seisin and possession being duly proved, shall be allowed to be good, valid and effectual in law for barring the action."

We have also stated that, in order "to obtain title by adverse possession, a claimant must prove actual, open, notorious, hostile, continuous, and exclusive use of the property under a claim of right for at least a period of ten years." *Union Cemetery Burial Society of North Smithfield*, 292 A.3d at 1214 (internal quotation marks and brackets omitted). And we have further stated that, in order to prevail on a claim of

- 23 -

adverse possession, a party "must establish the required elements by strict proof, that is, proof by clear and convincing evidence." *Clark v. Buttonwoods Beach Association*, 226 A.3d 683, 690-91 (R.I. 2020) (quoting *DiPippo v. Sperling*, 63 A.3d 503, 508 (R.I. 2013)). This Court has also made it clear that "[u]pon ten years of uninterrupted, quiet, peaceful and actual seisin and possession of the land, good and rightful title vests immediately in the adverse claimant." *Id.* at 691 (quoting *Carnevale v. Dupee*, 783 A.2d 404, 412 (R.I. 2001)).

This Court has held that "[t]o require adverse possession under a claim of right is the same as requiring hostility, in that both terms simply indicate that the claimant is holding the property with an intent that is adverse to the interests of the true owner." *Clark*, 226 A.3d at 691 (quoting *DiPippo*, 63 A.3d at 508); *see Tavares v. Beck*, 814 A.2d 346, 351 (R.I. 2003) ("[T]he pertinent inquiry centers on the claimants' objective manifestations of adverse use rather than on the claimants' knowledge that they lacked colorable legal title."). It has been further established that "a claim of right may be proven through evidence of open, visible acts or declarations, accompanied by use of the property in an objectively observable manner that is inconsistent with the rights of the record owner." *Tavares*, 814 A.2d at 351. "A possessor's use is hostile if it is a use inconsistent with the right of the owner, without permission asked or given, such as would entitle the owner to a cause

of action against the intruder for trespass." *Clark*, 226 A.3d at 691 (quoting *DiPippo*, 63 A.3d at 508).

<h1 style="text-align:center">C</h1>

<h2 style="text-align:center">The Issue of Permission[13]</h2>

Permission to use another's land fatally undermines the element of hostility. *See Tefft v. Reynolds*, 43 R.I. 538, 542, 113 A. 787, 789 (1921) ("When a party enters into possession of land under permission or license from the owner, the presumption is that his possession is in subordination to the true owner in the absence of acts amounting to a disseizin."); *see also Butterfly Realty II*, 93 A.3d at 1032. To that end, this Court has stated that "[w]hen permission is granted for a particular use, a later use of the same kind cannot be characterized as adverse." *Hilley v. Lawrence*, 972 A.2d 643, 652 (R.I. 2009). However, "[a] permissive use may become hostile only when the permission has been withdrawn or when events have occurred indicating that the original permission no longer obtained." *Id.* (internal quotation marks, brackets, and deletion omitted); *see* 16 Richard R. Powell, *Powell on Real Property* § 91.05[5][a] at 91–32 (2000) ("When possession has begun under circumstances justifying that the true owner granted permission to the claimant, such

---

[13] The following are the full citations to this Court's decisions that will be extensively discussed in this section of this opinion: *Foley v. Lyons*, 85 R.I. 86, 125 A.2d 247 (1956); *Hilley v. Lawrence*, 972 A.2d 643 (R.I. 2009); *Barrow v. D & B Valley Associates, LLC*, 22 A.3d 1131 (R.I. 2011).

possession cannot acquire the character of *adverse* possession until the claimant rebuts the presumption of continued subservience.").

As discussed in the preceding paragraph, permission to use another's land negates the element of hostility. Citing *Foley*, it is plaintiffs' position, however, that the sale or conveyance of a servient parcel terminates any prior permission given. The defendant disagrees, asserting that the holdings of *Hilley* and *Barrow* (as defendant understands those holdings) apply, in that a prior owner of 36 Pine Hill Avenue (Mr. Cioe) granted verbal permission directly to plaintiffs to use the disputed area for their playset and construction materials and "the same initially permissive use continued and did not change from 1985, when such permission was granted, through May 16, 2016, when [Mr.] Micheli served his Notice of Intent and thereby revoked the prior permission granted by [Mr.] Cioe." Put simply, it is defendant's contention that, without any new act or change in use, the mere conveyance of a servient parcel does not change the permissive use into a hostile one for purposes of adverse possession. The defendant posits that, because *Foley* predated *Hilley* and *Barrow*, *Foley* is no longer "good law" and cannot "alter the later holdings" of this Court. (Emphasis omitted.)

It is our view that defendant misinterprets the holdings of *Hilley* and *Barrow* and underestimates the import of the *Foley* case. First, we note that the mere fact that the cases of *Hilley* and *Barrow* were issued after the issuance of the *Foley*

decision does not invalidate the holding of *Foley* on the basis of that chronological fact alone. Second, although *Foley* does predate *Hilley* and *Barrow*, a straightforward reading of the three cases indicates that *Hilley* and *Barrow* are not inconsistent with *Foley*. Rather, they can and should be read in conjunction with each other and in a manner that comports with the significance of the respective cases.

We are first guided by the factual scenarios presented in *Foley*, *Hilley*, and *Barrow*. In *Foley*, the complainants sought to establish an easement over an eight-foot driveway as well as to enjoin the respondents from interfering with the complainants' use of that driveway. *Foley*, 85 R.I. at 87, 125 A.2d at 247. The complainants had purchased property (lot 14) from one Ludger Ferland, who owned two adjoining lots (Nos. 13 and 14) with an eight-foot "boundary line" between them that served as a driveway. *Id.* at 87, 125 A.2d at 248. The complainants alleged that, at the time of the purchase, Mr. Ferland gave them oral permission to use a portion of lot 13 and informed the complainants that he would grant them a right-of-way over a portion of the driveway on lot 13 as soon as he sold that lot. *Id.* Mr. Ferland subsequently sold lot 13. *Id.* at 88, 125 A.2d at 248. At a later point, the respondents began construction of a cement wall along the property line of lot 13, which prompted complainants to seek a determination that there was a prescriptive

easement. *Id.*[14] It was the respondents' contention that the complainants' use was not "hostile or adverse and under a claim of right" in that "it was always a permissive use." *Id.* at 89, 125 A.2d at 248. We emphasize that it is clear from the facts recited in the *Foley* opinion that that case involved the sale of a *servient* parcel.

In stark contrast with the factual context of *Foley*, the Court in both *Hilley* and *Barrow* addressed the specific factual situations in which **dominant parcels** were subsequently sold to new owners. In *Hilley*, this Court considered the impact of the sale of a dominant parcel on uses that had been granted through prior consent by the owner of the servient parcel. *Hilley*, 972 A.2d at 647, 652. The plaintiffs were property owners who sought to enjoin the defendant from using a vehicle to cross their land in order to reach his lot. *Id.* at 647. According to the testimony elicited at trial, the plaintiffs (the owners of the servient parcel) had granted permission to the previous owners of the dominant parcel to pass over the land to reach the subject parcel. *Id.* In due course, the dominant parcel was eventually sold to the defendant, who had "neither asked for nor received permission from the Hilleys * * *." *Id.*

Similarly, in *Barrow*, the plaintiffs purchased a dominant parcel from individuals who had been previously given permission by their neighbor to use a portion of his property. *Barrow*, 22 A.3d at 1132-33. In addressing whether the

---

[14] The *Foley* opinion also alludes to the fact that Mr. Ferland "never carried out his promise to grant them a right-of-way over lot 13 when he sold it * * *." *Foley v. Lyons*, 85 R.I. 86, 88, 125 A.2d 247, 248 (1956).

- 28 -

permissive nature of the use came to an end when the previous owners of the dominant parcel conveyed the property to the plaintiffs, the Court answered in the negative. *Id.* at 1134. The Court in *Barrow* held that the reasoning in *Hilley* was applicable to the facts at issue in that case in that "a use that is originally permissive cannot ripen into a claim for adverse possession absent any new hostile act." *Id.*

Because *Foley* distinctly involved the sale of a **servient parcel**, whereas *Hilley* and *Barrow* dealt with the sales of dominant parcels, we are of the opinion that each of the differing holdings are sound and can readily be reconciled with one another. In *Foley*, this Court held that the sale of the servient parcel terminated the prior permission given to the complainants:

> "It is admitted that complainants' *original* user was permissive and by oral license. It therefore could not ripen into adverse user no matter how long continued provided such user was referable to the permission granted. * * * However, this oral license was revoked by Ferland's conveyance of lot 13 to the Hayhursts in 1929. * * * After such conveyance complainants' use could mature into an easement if all the necessary elements were present and proved by *clear* and *positive* evidence." *Foley*, 85 R.I. at 90, 125 A.2d at 249 (emphasis in original).

This well-reasoned conclusion is supported by the principle that permission is premised on the concept that it is a personal license possessed solely by the owner of the servient land. *See Tefft*, 43 R.I. at 542, 113 A. at 789. A license has been defined as:

> "[P]ermission to do an act or a series of acts on another's land that, absent authorization, would constitute trespass. Because permission is the voluntary grant of a *personal* privilege, the landowner may usually revoke consent at any time and thereby terminate the license. Given their revocable nature, licenses generally are not considered to reach the status of interests in land." Jon W. Bruce, James W. Ely, Jr. & Edward T. Brading, *The Law of Easements and Licenses in Land* § 1.4 (West 2026) (emphasis added); *see Boyce v. Cassese*, 941 So. 2d 932, 941 (Ala. 2006).[15]

As a result, the conveyance of a servient parcel to a subsequent person or entity that lacks knowledge of any prior permission terminates the personal license possessed by the owner.

The holding of *Foley* and its reasoning are not at all inconsistent with the holdings of *Hilley* and *Barrow*. In *Hilley*, this Court concluded that the trial justice's finding of the plaintiffs' permission granted to the previous owners of the dominant parcel defeated the defendant's claim of a prescriptive easement. *Hilley*, 972 A.2d at 652. The Court noted that "[w]hen permission is granted for a particular use, a later use of the same kind cannot be characterized as adverse." *Id.* In applying this principle to the facts at issue in *Hilley*, the Court determined that, because the use of the servient parcel by the previous owners was by permission from the outset, the defendant's "initial use was not hostile and could not ripen into a prescriptive

---

[15] Black's Law Dictionary defines "license" as "[a] permission, * * * revocable, to commit some act that would otherwise be unlawful; esp., an agreement * * * that it is lawful for the licensee to enter the licensor's land to do some act that would otherwise be illegal * * *." Black's Law Dictionary 1101 (12th ed. 2024).

- 30 -

easement." *Id.* The Court went on to hold that "[a] permissive use may become hostile only when the permission has been withdrawn or when events have occurred indicating that the original permission no longer obtained." *Id.* (internal quotation marks, brackets, and deletion omitted).

This Court in *Barrow* expressly rejected the plaintiffs' reliance on a Pennsylvania case, *Waltimyer v. Smith*, 556 A.2d 912 (Pa. Super. Ct. 1989), which involved the sales of both parcels after the time when the original permissive use had been granted. *Barrow*, 22 A.3d at 1135. The plaintiffs in *Barrow* relied on *Waltimyer* to support their argument that the permissive use terminated as a result of the sale of the dominant parcel to new owners. *Id.* The Court in *Barrow* stated that it was not persuaded by the Pennsylvania Superior Court's reasoning that "[t]he fact that a predecessor in interest may have made similar use of the land in question by permission does not affect the adverse character of a successor's use, because the predecessor's prior permissive use involves merely a revocable personal license." *Id.* (emphasis omitted) (quoting *Waltimyer*, 556 A.2d at 914). The Court in *Barrow* concluded that, because the permission had neither been withdrawn nor had the nature of the use changed, the plaintiffs had not proven the element of hostility. *Id.*

The conveyances of the dominant parcels in *Hilley* and *Barrow* yielded a different legal outcome from that in *Foley* because the permission to use the servient parcels continued to exist in the *Hilley* and *Barrow* cases in spite of the subsequent

- 31 -

sales of the dominant parcels.[16]  It follows that, because the right to grant permission is held only by the servient estate, a sale of a dominant parcel carries no legal consequence with respect to the permission granted to the dominant estate.  And the facts summarized in the *Hilley* and *Barrow* opinions do not indicate that permission was ever revoked by the respective servient estates; consequently, alternative clear and convincing proof was required to show occurrences demonstrating either the existence of new hostile acts or that the original permission no longer obtained. *See Hilley*, 972 A.2d at 652; *Barrow*, 22 A.3d at 1135.

The reasoning of the above-cited cases applies squarely to the instant case. Assuming *arguendo* that Mr. Cioe did grant plaintiffs permission to use the disputed area along the hemlock tree line, the record reflects that the subsequent owners, the Biziers, were unaware of any such permission having been given to plaintiffs.  It would be illogical to assume that permission to use the servient land continued when the successive owners had no knowledge of any prior permission.  The plaintiffs' use of the property could therefore be viewed as adverse because the new servient owner should have been on notice of the actual and open use by the dominant estate.

For these reasons, the trial justice erred in finding that, irrespective of whether the dominant or servient parcel was sold, "such alienation does not constitute a new

_____

[16]     We note that in *Barrow* the servient estate was conveyed to subsequent owners that had knowledge of the prior permission granted. *Barrow*, 22 A.3d at 1132 n.4.

hostile act for purposes of acquisition through adverse possession." We therefore proceed to determine whether plaintiffs have satisfactorily established the element of hostility for purposes of an adverse possession claim.

## D

### The Element of Hostility

The plaintiffs contend that they have proven, by clear and convincing evidence, that they have adversely possessed not only the portion of the disputed area which the trial justice found they had adversely possessed but rather the *entire* disputed area. The defendant disagrees, contending that plaintiffs have failed to establish the element of hostility as to any portion of the entire disputed area.

The trial justice noted that "while there [wa]s little factual dispute as to what the Desrochers did on the area at issue in this case, the defendant's main argument is that the Desrochers had permission from Mr. Cioe and that said permission was given during the conversation between the parties in 1985." Having ruled that, pursuant to his reading of *Barrow*, neither the sale of the servient nor the sale of the dominant parcel constituted a new hostile act, the trial justice proceeded to find that plaintiffs had not established the element of hostility by clear and convincing evidence for the portion of the disputed area that existed along the tree line. The trial justice emphasized that the "conversation between Mr. Desrochers and Mr. Cioe [wa]s murky at best" with respect to whether Mr. Cioe granted permission to

plaintiffs to use the land. The trial justice did, however, find that, because permission (assuming it was granted to plaintiffs) ended at the tree line, the portion of the disputed area that continues after the ending of the previous tree line was sufficiently hostile.

Based on the record before us, we are of the opinion that further fact-finding by the trial court is required. As it relates to the parcel of the disputed area that exists along the previous tree line, the trial justice's analysis incorrectly focused on the issue of Mr. Cioe's alleged permission based on his interpretation of the law. Because we have determined that *Foley* directly applies to the facts of this case, a remand for additional findings based on the application of *Foley* is necessary. *See Butterfly Realty v. James Romanella & Sons, Inc.*, 45 A.3d 584, 590, 592 (R.I. 2012) (*Butterfly Realty I*).

In a somewhat similar fashion, as it concerned the parcel of the disputed area that extends beyond the tree line, the trial justice's finding that plaintiffs' use was sufficiently hostile because any alleged permission terminated at the tree line was insufficient and lacked factual foundation in the evidence introduced at trial. While the record supports the trial justice's ruling that Mr. Cioe's alleged permission terminated at the end of the tree line, a focused inquiry as to whether plaintiffs' use was hostile must be made with more specific findings of fact. *See Koziol Firearms, Inc. v. Marchand*, 334 A.3d 439, 444-45 (R.I. 2025) (remanding in part for further

- 34 -

fact-finding because the Court concluded that it was "evident * * * that the fact-finding that a trial justice must ordinarily undertake * * * did not occur in this case"); *Carnevale v. Dupee*, 853 A.2d 1197, 1202 (R.I. 2004) (remanding the case for further findings of fact because the trial justice failed to fully analyze whether the defendant had met the requirements of § 34-7-1).

## E

## The Location of the Disputed Area

Lastly, in his cross-appeal, defendant asserts that plaintiffs failed to prove their claim for adverse possession because they did not establish by clear and convincing evidence the "exact location and dimensions of the Disputed Area * * *." To support this position, defendant relies upon this Court's holding in *Coscina v. DiPetrillo*, 186 A.3d 590 (R.I. 2018).

In *Coscina*, the Court made it clear that "an accurate description of the lands, tenements or hereditaments is an essential element of the claim itself and not an issue that can be decided in the absence of a trial." *Coscina*, 186 A.3d at 596 (internal quotation marks omitted). We note that the *Coscina* case was before this Court in a different procedural posture from that presented by the case at bar. This Court in *Coscina* vacated summary judgment because it held that "without a clear demarcation of the boundary lines, and without clear and convincing evidence of the areas that were adversely possessed, there can be no summary judgment." *Id.* The

- 35 -

Court specifically noted that "[i]n an attempt to resolve these factual issues, the hearing justice ordered an evidentiary hearing regarding the boundary of the back pasture and engaged in fact-finding, which is not permitted at the summary judgment stage." *Id.* at 597.

While *Coscina* is instructive as to the principle that a party claiming adverse possession must establish by clear and convincing evidence the location of the areas that said party contends have been adversely possessed, we agree with the trial justice in the instant case that a metes and bounds description of the boundary is not strictly required. In this case, the trial justice found that it was uncontested that the line of hemlocks served "as the demarcation of the boundary line of where the permission was given for use between the two properties and has been established with enough particularity to serve as a basis for a boundary line." We discern no reason to disturb this ruling. The testimony and other evidence produced at trial support the trial justice's finding that the previous tree line was established by clear and convincing evidence as a boundary line.

It is noteworthy that every witness provided testimony as to the existence of the tree line. Additionally, some witnesses, particularly Mr. Desrochers, testified at length relative to multiple exhibits portraying the disputed area and the specific uses and activities that occurred thereon. For example, various exhibits were admitted at trial depicting the areas that contained stone dust, cobblestones, mulch, grass, and

the playset. There was testimony elicited at trial and exhibits were introduced relative to the stakes placed during the 2013 survey and the placing of a string between the stakes by defendant and his father. Furthermore, in referencing the exhibits which showed the boundary line stakes and strings as well as the previous hemlock tree line (and the stumps that existed after the removal of the trees) and the playset, Mr. Desrochers also provided estimates as to the footage and shape of the disputed area.

It is further significant that the parties in the Superior Court jointly filed a statement of stipulated facts, in which both parties expressly stated that the 2013 survey "fairly and accurately depicts the location of the boundary between the Desrochers Property and the Micheli Property as described in the respective deeds. It also fairly and accurately depicts the locations of the encroachments * * *, as they existed in June of 2013." Additionally, the stipulated facts indicated that the survey showed that "a portion of the playground structure and some of [Mr. Desrochers'] construction equipment encroached onto the Micheli Property relative to the boundary shown on the [2013] survey." *See Union Cemetery Burial Society of North Smithfield*, 292 A.3d at 1217. For these reasons, it is our view that plaintiffs have introduced clear and convincing evidence as to the disputed area that existed along the previous tree line.

The defendant also takes issue with the trial justice's conclusion that "the [plaintiffs] have adversely possessed the portion of the disputed area that lies from the western footings of the playset east into the woods where the staging area is kept." The defendant contends that "there was no specific testimony given about the western footings of the playset east into the woods, and there was never any conclusive evidence concerning where or when the construction staging area * * * came to be on the Disputed Area." (Internal quotation marks omitted.)

Our review of the record reveals that the evidence produced at trial only established that the tree line ended and the staging area began at the southeast corner of the playset. Specifically, Mr. Desrochers testified that, since 1991 to "the east, going back" from the southeast corner of the playset, he has stored some of his construction equipment—*viz.*, "[a]luminum poles and staging." He added that this "staging" area ran approximately up to the tree line. Because the trial justice did not make any findings as to the location of the disputed area beyond the hemlock tree line, a factual determination as to the location of that specific portion of the disputed area is needed.

In summation, we are remanding this case for further factual findings as to the element of hostility with respect to both portions of the disputed area and the location of the disputed area beyond the hemlock tree line. We additionally note that, if the parties wish to obtain a description with specificity as to the location and dimensions

- 38 -

of the disputed area (i.e., a metes and bounds description) for recording purposes, the Superior Court, on remand, may order the parties to have a survey of the area carried out.

# V

## Conclusion

For the reasons set forth in this opinion, we affirm in part and vacate in part the judgment of the Superior Court and remand the case to the Superior Court for further proceedings consistent with this opinion. The record may be returned to that tribunal.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE

Licht Judicial Complex
250 Benefit Street
Providence, RI 02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Raymond Desrochers et al. v. Luigi Micheli III. |
| **Case Number** | No. 2025-185-Appeal.<br>No. 2025-186-Appeal.<br>(PM 16-2363) |
| **Date Opinion Filed** | June 4, 2026 |
| **Justices** | Suttell, C.J., Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice William P. Robinson III |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Christopher K. Smith |
| **Attorney(s) on Appeal** | For Plaintiffs:<br><br>Kelly M. Fracassa, Esq. |
| | For Defendant:<br><br>Nicole M. Labonte, Esq. |